UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PETTY OFFICER FIRST CLASS | * | |
| JERED SASEN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 16-cv-10416-ADB |
| | * | |
| RAY MABUS, in his official capacity as | * | |
| Secretary of the Navy, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

### I.    INTRODUCTION

On February 29, 2016, Jered Sasen ("Sasen") brought suit against Ray Mabus in his

official capacity as Secretary of the Navy ("Mabus"), alleging violations of the Fifth Amendment

and Article 31 of the Uniform Military Code of Justice. [ECF No. 1]. Presently pending before

this Court are Sasen's Motion for Summary Judgment [ECF No. 18] and Mabus' Motion for

Order to Affirm Agency Decision [ECF No. 22]. For the reasons explained below, the Court

GRANTS Mabus' motion, DENIES Sasen's motion, and enters summary judgment in favor of

Mabus.

### II.    FACTUAL BACKGROUND

The material facts in this case are largely undisputed. Both parties submitted and relied

upon the administrative record on file with the Board for Correction of Naval Records and Navy

Personnel Command ("Administrative Record").[1] [ECF No. 14]. In accordance with Local Rule

56.1, Sasen submitted a concise statement of undisputed material facts in support of his Motion

---

[1] All citations to the Administrative Record will use "AR."

for Summary Judgment with citations to the Administrative Record. [ECF No. 19]. Because Mabus has not disputed any of these facts, in accordance with the procedures set forth in Local Rule 56.1, those facts are deemed admitted for purposes of this Memorandum and Order provided they are consistent with the Administrative Record.

In 2006, Sasen enlisted in the Navy and had an impressive career there through to his honorable discharge in 2016. During the relevant time period, Sasen was a Petty Officer First Class (pay grade E-6) and qualified as a Commanding Duty Officer. At all relevant times, he was stationed aboard the USS Constitution berthed at the Charlestown Navy Yard in Charlestown, Massachusetts. At the time of the incident that resulted in this lawsuit, he was a "Frocked" Chief Petty Officer, which allowed him to "assume the title and wear the uniform of a higher pay grade without entitlement to the pay and allowances of that grade" and provided "early recognition for members selected for petty third class through chief petty officer." [ECF No. 23-1]. He had been recommended for a promotion. Sasen was qualified as an Enlisted Surface Warfare Specialist and Enlisted Aviation Warfare Specialist. Further, he had received numerous awards and accolades, including the Sailor of the Year award in 2012, the Navy Achievement Medal, the Battle Effectiveness Award, the Good Conduct Medal, the Global War on Terrorism Expeditionary Medal, and the Global War on Terrorism medal. He had also received many glowing performance evaluations that recommended him for advancement.

### a. January 11, 2014 – the Incident

On January 11, 2014, Elizabeth Abril, a sailor in Sasen's unit, injured her hand. At the time, Sasen was on watch aboard the USS Constitution. Abril told Sasen that she injured her hand punching a bulkhead out of frustration with another sailor who had cancelled their planned outing. Sasen asked her whether she wanted to report that she had slipped and fallen, rather than

reporting the truth. Before Abril was able to respond, a superior called Sasen and Sasen informed him that Abril had fallen. Sasen sent Abril to the emergency room, accompanied by another sailor, Matthew Fairchild. Once she returned from the emergency room, she texted Sasen that she was fine and had returned to the vessel. The next morning, January 12, 2014, when Sasen was relieved by Lieutenant Julien Geiser, he reported to him that Abril had fallen and injured her hand. Later that same morning, Abril was contacted by a Navy official who requested her paperwork from the hospital. That evening, Abril reported to the CDO[2] that she had injured her hand by punching a bulkhead, and not by falling.

### b. January 13, 2014 – Enlisted Disciplinary Review Board, Article 31(b) Warning, and Voluntary Statements

On January 13, 2014, Sasen was questioned about the incident by Senior Chief Petty Officers Nancy Estrada and Kelvin Wiggins at an Enlisted Disciplinary Review Board ("DRB").[3] The Navy Personnel Command Instruction 5811.1 ("NAVPERSCOM INST") provides that a servicemember shall be informed, prior to any questioning, of his right "to remain silent and make no statement at all," and that any statement "can be used against [him] in a trial by court-martial or other judicial or administrative proceeding." [ECF No. 23-2]. Article 31(a) of the Uniform Code of Military Justice ("UCMJ") provides that "[n]o person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." 10 U.S.C. § 831(a). Article 31(b) requires a warning that no statement solicited in violation of Article 31 may be used against him in a trial by court-martial. Id. § 831(b). Sasen was not informed of his right against self-incrimination under Article 31

---

[2] The Court understands "CDO" to refer to Commanding Duty Officer.
[3] A DRB at the Navy was used "to screen disciplinary cases of enlisted personnel and make recommendations [regarding] disposition." NAVPERSCOM INST 5811.1 (May 21, 2007); [ECF No. 23-2]. According to both parties, the instruction lapsed on July 25, 2016.

before or during the DRB. He admitted at the DRB that he had misreported the cause of Abril's

hand injury to Lieutenant Geiser.[4] The DRB recommended that Sasen's promotion

recommendation be rescinded and referred him to Captain's Mast.

Later that morning, following the DRB, Lieutenant Geiser met with Sasen and informed

him that he was suspected of violating provisions of the UCMJ. Sasen then signed a waiver of

his Article 31 rights, entitled "Military Suspect's Acknowledgment and Waiver of Rights" that

contained an Article 31(b) warning. He was not provided with a "cleansing" warning to the

effect that his prior unwarned statements, including those to the DRB, could not be used against

him. After waiving his rights, he provided Lieutenant Geiser with a written statement, again

confessing to lying to him about the cause of Abril's injury. Specifically, Sasen wrote that he had

reported to his superior that Abril had injured her hand by slipping and falling. He explained that

he regretted his decision to lie and had failed to consider the broader ramifications at the time.

There is no evidence in the record, and Sasen does not argue, either that the DRB statements

were directly used against him by Lieutenant Geiser or that they were used against him in a

court-martial or other criminal proceeding.

Abril also signed a waiver of her Article 31 rights and voluntarily provided a statement

about the incident. She wrote that after she told Sasen the truth about the cause of her injury, he

asked her whether she would prefer reporting that she slipped and fell. Before Abril was able to

answer, the superior called and Sasen reported that Abril had fallen. Fairchild, the sailor who

accompanied Abril to the hospital, also wrote a voluntary statement indicating that Abril had

asked him to lie about how she injured her hand. Abril confirmed that it had originally been her

---

[4] There is no transcript of what happened at the DRB, but the parties do not dispute the material facts for purposes of summary judgment.

intention to lie about the incident.

### c. Captain's Mast[5]

On January 15, 2014, Sasen received notice that his Commanding Officer, Captain Sean Kearns, was considering imposing non-judicial punishment ("NJP") for violations of the UCMJ: specifically for dereliction of duty for failing to truthfully report the incident in violation of Article 92, and making a false statement to Lieutenant Geiser in violation of Article 107. Sasen reported to Captain's Mast before Captain Kearns. Sasen was advised that he could seek legal counsel before deciding whether to accept a NJP or to proceed to a court-martial. He elected to forego his right to counsel, and signed a written release to that effect. AR 34–35. At Captain's Mast, Sasen again admitted that he had misreported the cause of Abril's hand injury. Captain Kearns concluded that Sasen was guilty of both charges and issued a written reprimand.

On January 23, 2014, Captain Kearns issued an Adverse Performance Evaluation Report to Sasen, which stated that the report was "submitted in order to withdraw member's promotion recommendation." AR 60. It noted that, in addition to the NJP, "[d]uring this reporting period, Petty Officer Sasen has shown a pattern of lapses in judgment, poor leadership, follow-through and Sailor care. He has demonstrated an inability to adhere to the Navy Core Values and, although selected, he is no longer recommended for advancement to Chief Petty Officer." Id. On January 24, 2014, Captain Kearns permanently removed Sasen's advancement recommendation "due to violation of UCMJ, Article 92: Dereliction of duty and Article 107: false official statement." AR 131.

---

[5] "Under the Uniform Code of Military Justice, military commanders can punish service personnel through judicial proceedings—taking the form of general, special, or summary courts martial—or by imposing non-judicial punishment ("NJP"). . . . NJP is referred to as 'captain's mast' or 'mast' in the sea services . . . . For most purposes, NJP is deemed an administrative rather than criminal proceeding." Piersall v. Winter, 507 F. Supp. 2d 23, 29 (D.D.C. 2007).

**d.  Appeals and the decision of the Board of Correction of Naval Records Decision**

On January 23, 2014, Sasen appealed the imposition of the NJP (the written reprimand) to Vice Admiral Scott H. Swift, arguing that his punishment was disproportionate to the offense and that he had not received due process as a result of not having been advised of his rights prior to the DRB. Although Sasen understood that the NJP would not formally reduce his rank, he was concerned that it would delay his promotion. Captain Kearns, the Commanding Officer who issued the NJP, wrote a letter, dated January 28, 2014, in which he recommended that the appeal be denied. In his letter, Captain Kearns explained that "[t]he decisions . . . at NJP were based on the statements of DC1 Sasen and ABHAN Abril and not, in any part, from information that came out of the DRB." AR 53. In addition to Sasen's false report about the cause of Abril's injury, Captain Kearns explained that "[h]is handling of the situation was completely inappropriate as he disobeyed my Standing Orders by not informing me that he had sent one of my Sailors to the Emergency Room for treatment." Id. Additionally, he wrote that "DC1 Sasen misrepresented the incident to the relieving CDO, my SWO, and it was my SWO that called to report the incident the following morning." Id. Moreover, Captain Kearns noted that an appeal of the NJP was not the proper forum to discuss a promotion recommendation, which was a separate administrative action from the imposition of the NJP at Captain's Mast. He further explained that, even with the NJP on his record, Sasen could still be promoted to Chief Petty Officer in as little as three years. AR 54.

On February 14, 2014, Sasen's appeal was denied. Admiral Swift concluded that Sasen's statements following the DRB were voluntary and preceded by an Article 31(b) warning, and further that the DRB proceedings did not adversely impact the integrity of the Captain's Mast. He concluded that the punishment was "neither unjust nor disproportionate." AR 107.

6

On February 20, 2014, through counsel, Sasen petitioned the Board of Correction of Naval Records ("BCNR"), pursuant to 10 U.S.C. § 1552(a)(1),[6] to set aside the NJP. He challenged the written reprimand, the revocation of the promotion recommendation, and his adverse performance evaluation. Sasen argued that his non-judicial punishment was invalid because he did not get an Article 31(b) warning before the DRB or a cleansing warning when he did eventually get his warning and that, as a result, his post-DRB statements were involuntary given the totality of the circumstances.

On April 6, 2015, the BCNR denied the petition. In reaching its decision, the BCNR reviewed Sasen's application; naval record; applicable statutes, regulations, and policies; a March 11, 2015 Advisory Opinion provided by the Office of the Judge Advocate General, Criminal Law Division (Code 20) ("JAG Advisory Opinion"); and the January 28, 2014 letter written by Captain Kearns in which he recommended that the petition be denied. In his Advisory Opinion, the JAG Officer considered the same issues underlying the instant matter and concluded that the NJP was lawfully imposed. The BCNR concluded that there was no significant error in the NJP proceedings and further, it also "substantially concurred" with the recommendations of Captain Kearns and the JAG Advisory Opinion. The BCNR further explained that it had considered all potentially mitigating factors in its decision, but ultimately found that Sasen's record should not be altered given the seriousness of the misconduct and the lack of error in the Captain's Mast.

---

[6] 10 U.S.C. § 1552(a)(1) provides, in relevant part: "The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department."

### III.     PROCEDURAL BACKGROUND

On February 29, 2016, Sasen filed a complaint against Mabus asking this Court to review the BCNR decision pursuant to the Administrative Procedure Act ("APA"). The complaint alleges one count: "Violation of the APA" based on alleged violations of the Fifth Amendment, Article 31, and the Navy's own processes and procedures. Sasen requests that the Court declare the NJP void as it was obtained in violation of the Fifth Amendment and Article 31, issue an injunction to require the BCNR to remove the letter of reprimand, correct Sasen's adverse performance report, restore his recommendation for promotion to Chief Petty Officer, and award attorneys' fees and costs.

On July 25, 2016, Sasen moved for summary judgment [ECF No. 18], and filed an accompanying Statement of Material Facts pursuant to Local Rule 56.1 [ECF No. 19] and a memorandum of law in support [ECF No. 21]. On September 9, 2016, Mabus filed a Motion for Order to Affirm Agency Decision [ECF No. 22] with a supporting memorandum of law [ECF No. 23].[7]

### IV.     LEGAL STANDARD

Section 706 of the APA provides for judicial review of an agency decision. 5 U.S.C. § 706. The Department of the Navy is an agency whose acts are subject to judicial review under the APA. See Piersall v. Winter, 435 F.3d 319, 325 (D.C. Cir. 2006); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983). Sasen specifically challenges the BCNR's decision not to reverse the effects of his non-judicial punishment under §§ 706(2)(A), (B), (C), and (D), but also, in the alternative, asks this Court to find the BCNR decision arbitrary and capricious under

---

[7] The Court understands Mabus' motion to be a cross-summary judgment motion and an opposition to Sasen's motion to summary judgment.

§ 706(2)(A). The relevant provisions of § 706 state: "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action [and] shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law.

5 U.S.C. § 706. Section 706 further provides that when a reviewing court makes determinations under § 706(2), "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; see also Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61–63 (1st Cir. 2001) (holding that agency's failure to consult with other agencies before authorizing airline activity was harmless).

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "However, in cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record." Bennett v. Murphy, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (citing Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015)). "Under the APA, a reviewing court may set aside an agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' such as if it is 'unsupported by substantial evidence.'" Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015) (quoting 5 U.S.C. § 706(2)). "[T]he plaintiff has the burden of showing by cogent and clearly convincing evidence that the decision was the result of a material legal error or injustice." Piersall v. Winter, 507 F.

Supp. 2d 23, 33 (D.D.C. 2007) (quoting <u>Doyle v. England</u>, 193 F. Supp. 2d 202, 207 (D.D.C. 2002) (further internal quotation marks omitted).

Review under the APA is highly deferential and "[i]f the agency's decision is supported by any rational view of the record, a reviewing court must uphold it." <u>Atieh</u>, 797 F.3d at 138. Importantly, the Court "may not substitute [its] judgment for that of the agency, even if [it] disagree[s] with [the agency's] conclusions." <u>Sig Sauer, Inc. v. Brandon</u>, 826 F.3d 598, 601 (1st Cir. 2016) (quoting <u>Craker v. DEA</u>, 714 F.3d 17, 26 (1st Cir. 2013)). "Adjudication of these claims requires the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct." <u>Piersall</u>, 507 F. Supp. 2d at 33 (quoting <u>Kreis v. Sec'y of Air Force</u>, 866 F.2d 1508, 1512 (D.C. Cir. 1989)). With the exception of an agency's interpretation of its own statutes, <u>see</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 227 (2001), questions of law are reviewed *de novo*. <u>See</u> <u>Ruskai v. Pistole</u>, 775 F.3d 61, 67–68 (1st Cir. 2014); <u>see also</u> <u>Visiting Nurse Servs. of W. Mass., Inc. v. NLRB</u>, 177 F.3d 52, 56 (1st Cir. 1999); <u>J.J. Cassone Bakery, Inc. v. NLRB</u>, 554 F.3d 1041, 1044 (D.C. Cir. 2009) ("a reviewing court owes no deference to the agency's pronouncement on a constitutional question." (quoting <u>Lead Indus. Ass'n v. EPA</u>, 647 F.2d 1130, 1173–74 (D.C. Cir. 1980))).

## V.   DISCUSSION

### a.   Relief under § 706(A), (C), and (D) for the Navy's failure to provide Sasen with a cleansing warning

Sasen argues that the Navy's failure to provide a cleansing warning is a violation of Article 31(b) and its own internal regulations reviewable under § 706(2)(A)[8], (C), and (D).

---

[8] In making this argument, Sasen refers to the portion of § 706(2)(A) involving agency decisions that are not "in accordance with the law." The Court considers the § 706(2)(A) argument regarding arbitrariness and capriciousness infra.

Mabus argues that there was no Article 31 violation and that, even if there were, Sasen's rights were not prejudiced.

Article 31(b) of the UCMJ provides that:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

10 U.S.C. § 831(b). The parties do not dispute that Sasen was subject to Article 31(b). Mabus also does not seem to contest that the warning requirement of Article 31(b) is applicable to all proceedings, including DRBs and Captain's Masts. The key dispute is whether there was an Article 31 violation when statements solicited without an Article 31(b) warning and subsequent statements that were made after an Article 31(b) warning, but without Sasen having been told that his earlier statements could not be used against him (a cleansing warning), were relied upon in non-judicial punishment proceedings. Mabus argues that there was no such violation because Article 31(b) should be read in conjunction with Article 31(d) to show that "Article 31(b) is a privilege that applies in all proceedings, but Article 31(d) is an evidentiary rule that applies only in a trial by court-martial." [ECF No. 23 at 12]. Article 31(d) provides that "[n]o statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." 10 U.S.C. § 831(d). In Mabus' view, a failure to give a warning under Article 31(b) renders a confession inadmissible at a trial by court-martial, but using such statements in any other proceeding, including one that results in a non-judicial punishment, does not violate Article 31.

Sasen argues that Article 31(d) is silent on whether unwarned confessions are admissible at non-judicial punishment proceedings, and that this "silence is filled by regulations that make clear that the privileges must be enforced in non-judicial punishment proceedings." [ECF No. 24 at 3]. Specifically, Sasen points to the following internal guidance: (1) NAVPERSCOM INST 5811.1 Encl. (2) ¶ 4;[9] (2) Manual of the Judge Advocate General at 0110.e;[10] and (3) Manual for Courts-Martial United States (2012 Edition), Part V ¶ 4.c(1)(A).[11] Sasen also argues that Mabus

---

[9] NAVPERSCOM INST 5811.1 states that "[p]rior to any questioning at EDRB, the accused shall be properly advised of their rights per enclosure (3)." [ECF No. 23-2 at ¶ 4(a)]. Enclosure (3) is a Military Suspect's Acknowledgment and Waiver of Rights. It contains a list of advisements, including "I have the right to remain silent and make no statement at all" and "Any statement I do make can be used against me in a trial by court-martial or in other judicial or administrative proceeding." Enclosure (2) contains "procedures to be followed by the Enlisted Disciplinary Review Board (EDRB)." It provides "[p]rior to interviewing the accused, the EDRB shall ensure the accused is advised of their rights under the Uniform Code of Military Justice (UCMJ), article 31b. The accused will sign Enclosure (2), or a similar form, acknowledging an understanding of their rights prior to any questioning." Id. at Encl. (2) ¶ 4. Parties agree that this provision lapsed on July 25, 2016, but was operative during the relevant time period.

[10] Manual of the Judge Advocate General at 0110.e provides:

> If non-judicial punishment is contemplated on the basis of the record of a court of inquiry or other fact-finding body, a preliminary examination shall be made of such record to determine whether the individual concerned was accorded the rights of a party before such fact-finding body and, if so, whether such rights were accorded with respect to the act or omission for which non-judicial punishment is contemplated. If the individual does not exercise his right to demand trial by court-martial, or if he does not have that right, the individual may submit, in writing, any matter in defense, extenuation, or mitigation to the officer considering imposing the non-judicial punishment. If the individual was accorded the rights of a party with respect to the act or omission for which non-judicial punishment is contemplated, such punishment may be imposed without further proceedings. If the individual was not accorded the rights of a party with respect to the offense for which punishment is contemplated, the procedure prescribed in paragraph 4 of Part V, MCM, must be conducted. In the alternative, the record of the fact-finding body may be returned for additional proceedings during which the individual shall be accorded the rights of a party with respect to the act or omission for which non-judicial punishment is contemplated.

Dep't of Navy, Manual of the Judge Advocate General (JAGMAN) (2012), available at http://www.jag.navy.mil/library/instructions/JAGMAN2012.pdf.

[11] Manual for Courts-Martial United States (2012 Edition), Part V ¶ 4.c(1)(A):

improperly conflates Article 31(b) and 31(d), and that Congress provided § 706(2)(C) of the APA[12] as the remedy for using unwarned confessions at non-judicial punishment proceedings. Id.

The First Circuit has described Article 31 as "a statutory requirement to warn of the right to silence without regard to any 'custody' test before a person operating under the Uniform Code of Military Justice may even request a statement from a suspect, 10 U.S.C. § 831(b), lest the statement be suppressed as evidence, § 831(d)." United States v. Rogers, 659 F.3d 74, 79 (1st Cir. 2011) (citing United States v. Schneider, 14 M.J. 189, 192 (C.M.A. 1982)). Article 31 thus "protect[s] the unwary subordinate against the subtle coercion of the military rank structure." Schneider, 14 M.J. at 193. "Moreover, [a subordinate servicemember] may be especially amenable to saying what he thinks his military superior wants him to say—whether it is true or not. Thus, the serviceperson needs the reminder required under Article 31 to the effect that he need not be a witness against himself." United States v. Armstrong, 9 M.J. 374, 378 (C.M.A.

---

c. *Non-judicial punishment accepted.*
(1) *Personal appearance requested; procedure.*
    Before non-judicial punishment may be imposed, the servicemember shall be entitled to appear personally before the non-judicial punishment authority who offered non-judicial punishment, except when appearance is prevented by the unavailability of the non-judicial punishment authority or by extraordinary circumstances, in which case the servicemember shall be entitled to appear before a person designated by the non-judicial punishment authority who shall prepare a written summary of any proceedings before that person and forward it and any written matter submitted by the service member to the non-judicial punishment authority. If the servicemember requests personal appearance, the servicemember shall be entitled to: (A) Be informed in accordance with Article 31(b) . . . .

Manual for Courts-Martial (MCM), United States (2012), available at https://www.loc.gov/rr/frd/Military_Law/pdf/MCM-2012.pdf.

[12] "The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

1980). The U.S. Court of Military Appeals has described "Article 31(b) [as] provid[ing] technica1 warning requirements similar to those prescribed in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and Article 31(a) and (d) provide the Fifth Amendment substantive due process protection against involuntary confessions delineated in <u>Bram v. United States</u>, 168 U.S. 532 (1897)." <u>United States v. Steward</u>, 31 M.J. 259, 263 (C.M.A. 1990) (internal footnote omitted).

   i. <u>Alleged Article 31 violation</u>

  While the First Circuit has not directly addressed this issue, courts that have interpreted Article 31 construe it narrowly to apply only to statements that may be used at trials by court-martial. <u>See</u> <u>United States v. Singleton</u>, 600 F.2d 553, 555 (5th Cir. 1979) ("article 31(b) by its terms is limited to evidence used in a trial by court-martial"); <u>see also</u> <u>Spear v. Andraschko</u>, 64 F. App'x 165, 166 (10th Cir. 2003) ("language of this provision [§ 831(b)] of the Uniform Code of Military Justice clearly states that it protects against self-incriminatory statements that may be used as evidence against a suspect or accused 'in a trial by court-martial.'"); <u>Brosius v. Warden, U.S. Penitentiary, Lewisburg, PA</u>, 278 F.3d 239, 248 (3d Cir. 2002); <u>United States v. Santiago</u>, 966 F. Supp. 2d 247, 258 (S.D.N.Y. 2013) (holding that "Article 31 does not apply to a trial in a civilian court" and collecting cases).

  Sasen has not cited to any case where a court has interpreted Article 31 as barring the use of unwarned statements at non-judicial punishment proceedings and instead cites only to the article itself and Navy regulations and guidance. He does highlight, however, that there is an interpretive relationship between Article 31(a) and the Fifth Amendment and between Article 31(b) and <u>Miranda</u>. "[W]hile Article 31(a) and the Fifth Amendment coincide in scope and while Article 31(b) was enacted to serve the purpose of avoiding coerced statements in violation of both provisions, unique factors in the military environment—unknown in the civilian setting—

14

lead us to interpret Article 31(b) as being broader in the scope of its protection than is the mandate of <u>Miranda</u>." <u>United States v. Ravenel</u>, 26 M.J. 344, 349 (C.M.A. 1988). The Court of Military Appeals has held that "[c]areful consideration of the history of the requirement of warning [in Article 31(b)], compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self-incrimination." <u>Ravenel</u>, 26 M.J. at 348–49 (quoting <u>United States v. Gibson</u>, 14 C.M.R. 164, 170 (1954)). Unlike a <u>Miranda</u> warning, an Article 31(b) warning is required regardless of whether the servicemember is in custody or not. <u>See</u> <u>Rogers</u>, 659 F.3d at 79. Article 31(a), however, "was not intended to go beyond the scope of the Fifth Amendment." <u>Armstrong</u>, 9 M.J. at 380.

The Court does not reach the question of whether Article 31 bars the admission of statements solicited in violation of Article 31 in non-judicial punishment proceedings because, even if Article 31's protections did extend so far, the lack of an Article 31(b) warning at the DRB was harmless and the use of uncleansed statements would not violate Article 31 on this record.

## ii.   Harmlessness of unwarned DRB statements

The APA provides that when a court conducts its review under § 706, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; <u>see generally</u> <u>Nat'l Ass'n of Home Builders v. Defs. of Wildlife</u>, 551 U.S. 659–60 (2007) ("In administrative law . . . there is a harmless error rule." (quoting <u>PDK Labs. Inc. v. U.S. Drug Enforcement Admin.</u>, 362 F.3d 786, 799 (D.C. Cir. 2004))); <u>cf.</u> <u>Brosius</u>, 278 F.3d at 248 (holding violation of Article 31(b) harmless on habeas review). "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence." <u>Combat Veterans for Cong. Pol. Action Comm. v. Fed. Election Comm'n</u>, 795 F.3d 151, 157 (D.C. Cir. 2015); <u>cf.</u> <u>Nieves-Villanueva v. Soto-Rivera</u>,

133 F.3d 92, 102 (1st Cir. 1997) ("In a civil case, the party asserting error bears the burden of demonstrating that the error was harmful, i.e., that it affected that party's substantial rights."). Here, the record suggests that Captain Kearns did not rely on the DRB statements and, further, there was a substantial basis to impose the NJP without reliance on the unwarned DRB statements. Specifically, he relied on Sasen's own statements at Captain's Mast, combined with Abril's admissions. Thus, this Court cannot conclude that the failure to provide an Article 31(b) warning at the DRB impacted the imposition of the NJP in this case where the subsequent statements were voluntary.

### iii.   Voluntariness of the uncleansed statements

Even assuming Article 31 applied to bar self-incriminating statements solicited in violation of Article 31 from being used during non-court-martial proceedings, Article 31 was not violated during the post-DRB proceedings. Sasen was given an Article 31(b) warning, but no cleansing warning, following the DRB and before the Captain's Mast. He waived his Article 31 rights and made admissions that supported the allegations against him, namely that he lied to his supervisor regarding the cause of Abril's injury, failed to report it to Captain Kearns, and failed to follow-up with Abril as required. The NJP authority relied on these post-DRB statements, but not the unwarned statement he made during the DRB. Although the BCNR did not explicitly address the voluntariness of Sasen's post-DRB statements, it concluded that there was no error in the NJP proceedings. AR 3. It further noted that it "substantially concurred" with the Navy Staff's analysis of Sasen's NJP appeal and the recommendation in the JAG Advisory Opinion. AR 2. The JAG Advisory Opinion argued that Sasen's statements were voluntary despite the lack of a cleansing warning because he was a frocked Chief with the requisite status to knowingly waive his Article 31 rights. AR 8. Given that there is no suggestion of coercion with

respect to the pre-, or more importantly, the post-DRB statements, the Court sees no reason to disturb this conclusion.

At a trial by court-martial, self-incriminating statements are "admissible if the Government established that [each] was preceded by an Article 31(b) warning and was not the product of the earlier violation of Article 31(b)." United States v. Phillips, 32 M.J. 76, 79 (C.M.A. 1991) (emphasis omitted). Even when there was a prior Article 31(b) violation, subsequent statements are not presumptively tainted when the violation was only "technical." Id. at 264–65. "The appropriate legal inquiry in such a case is whether [the] subsequent confession was voluntary considering all the facts and circumstances of the case including the earlier technical violation of Article 31(b)." Phillips, 32 M.J. at 80 (citing Steward, 31 M.J. at 265). In so holding, the Phillips court clarified some confusion involving the applicability of Oregon v. Elstad, 470 U.S. 298 (1985) in the military context. A "technical" violation of the Article 31(b) warning requirement occurs when the initial statement was voluntary although the requisite warning was not provided. See Steward, 31 M.J. at 263 n.1 ("We use the word 'technical' in the same sense intended by the majority of the Supreme Court in Oregon v. Elstad, 470 U.S. 298, 318 (1985)."). In conducting this totality of the circumstances inquiry, a court must determine "whether the circumstances as a whole satisfy [it] that [the] admissions to [the superior] were made voluntarily." Phillips, 32 M.J. at 80. The voluntariness of a confession is a question of law. United States v. Freeman, 65 M.J. 451, 453 (C.A.A.F. 2008); see also United States v. Feliz, 794 F.3d 123, 131 (1st Cir. 2015) (noting that, in Fifth Amendment context, "[t]he voluntariness of a defendant's confession is a question of law meriting de novo review." (quoting United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014)).

Here, the record does not indicate that there was any actual coercion, duress, or

inducement in soliciting Sasen's statement at the DRB or his subsequent statement at Captain's

Mast. Thus, any possible Article 31(b) violation at the DRB would have been technical and there

would be no presumptive taint to subsequently warned statements. As the JAG Advisory Opinion

found, the totality of the circumstances indicate that Sasen's post-DRB confessions were also

voluntary despite the failure to give him a cleansing warning. Before Captain's Mast, Sasen

signed a waiver that informed him of his Article 31 rights, indicating that his statement was

voluntary and that he waived his Article 31 rights. Sasen was a frocked Chief, which, as the

recommendation to the BCNR regarding Sasen's appeal noted, "demonstrate[d] sufficient age,

intelligence, and length of service to make a full and knowing waiver of his rights." AR 8. The

fact that Sasen was not provided a cleansing warning, although not helpful to the government,

does not alone render the statements involuntary. For subsequently warned statements to be

admissible, a cleansing warning is not legally required. Phillips, 32 M.J. at 81 (citing United

States v. Spaulding, 29 M.J. 156, 160 (C.M.A. 1989)); see also United States v. Lichtenhan, 40

M.J. 466, 469–70 (C.M.A. 1994) ("the absence of a 'cleansing warning' did not make appellant's

confession inadmissible"). Instead, "noncompliance with Article 31(b) [i]s one circumstance to

be considered along with others in determining whether the statements made by appellant after

receiving a warning were voluntary." United States v. Byers, 26 M.J. 132, 135 (C.M.A. 1988).

Further, Sasen's post-DRB confession was hand-written, indicating that it was deliberate

and thoughtful. He also repeated his confession at the Captain's Mast despite the fact that it does

not appear that anyone at the Captain's Mast referenced his earlier confession at the DRB.

Additionally, the person who questioned him at Captain's Mast, Captain Kearns, was different

from those who questioned him at the DRB and those who provided him with the Article 31(b)

warning following the DRB, thereby creating some separation between the two proceedings.

Such circumstances cut against Sasen's assertion that he continued to confess only because he felt that the "train had left the station." Finally, there is no evidence of any coercive tactics, physical or otherwise, that would render Sasen's statements involuntary. Cf. United States v. Norfleet, 36 M.J. 129, 131 (C.M.A. 1992) (holding that military judge did not err in finding statements voluntary even where servicemember had below average intelligence and where superiors had allegedly promised his family counseling if and only if he confessed).[13]

Accordingly, the BCNR's finding that there was a "lack of error within the NJP proceeding" is adequately supported and the Court finds no Article 31 violation in using Sasen's uncleansed statements at the NJP proceedings.

### iv.   Navy regulations

Sasen argues that apart from Article 31 and the Fifth Amendment, Navy regulations required that he be read his Article 31 rights prior to any questioning and that he be given a cleansing warning prior to any later questioning in the event he was not originally read his rights. Specifically, Sasen again relies on (1) NAVPERSCOM INST 5811.1 Encl. (2) ¶ 4;[14] (2) Manual of the Judge Advocate General at 0110.e;[15] and (3) Manual for Courts-Martial United States (2012 Edition), Part V ¶ 4.c(1)(A).[16] [ECF No. 24 at 3]. Mabus argues that the Navy regulations are consistent with interpreting Article 31 as creating a privilege not to incriminate oneself that can be asserted at non-judicial punishment proceedings, but do not require that compelled

---

[13] Sasen notes that the court in Phillips held that "the Government must shoulder the burden to prove 'by a preponderance of the evidence that a statement by the accused was made voluntarily before it may be received into evidence.'" Phillips, 32 M.J. at 80 (quoting Mil. R. Evid. 304(e)(1)). Sasen never presented this issue to the BCNR. See Piersall, 507 F. Supp. 2d at 32 ("This is an action for review of the Secretary's handling of [plaintiff's] BCNR petition, and the Court must consider the basis that the agency relied on for its action, not some other basis.").

[14] See supra note 9.

[15] See supra note 10.

[16] See supra note 11.

statements be excluded from such proceedings.

The Court does not read these Navy regulations as expanding the explicit protections of Article 31. They require that service members be provided the necessary warnings pursuant to Article 31(b) at non-court martial proceedings, but they do not explicitly extend the exclusionary rule in Article 31(d) to such proceedings or provide Article 31(a) protections outside of trials by court-martial. These regulations make clear where the Article 31(b) privilege applies, but not where Article 31 is violated. This is consistent with the BCNR's finding that there was no error in the NJP proceedings. Moreover, Sasen nowhere argues that the Navy's regulations should be given deference as interpretations of the UCMJ. Sasen has failed to establish that relying on statements solicited after a failure to provide a cleansing warning, which he asserts is a requirement under Navy regulations, at an NJP proceeding itself constitutes a violation of those regulations. In other words, it is unclear whether Navy regulations require that statements solicited without a cleansing warning be excluded in a NJP proceeding.

The Supreme Court has held that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." Morton v. Ruiz, 415 U.S. 199, 235 (1974); see also State of Maine v. Thomas, 874 F.2d 883, 890 (1st Cir. 1989) (collecting cases). As discussed above, however, the APA provides that when a court conducts its review under § 706, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

Mabus does not dispute that Sasen was not read his Article 31 rights prior to the DRB or that he was never provided a cleansing statement, but such violations of Navy regulations would have been harmless in this case. First, the conclusions reached at the NJP proceedings had

sufficient support without relying on Sasen's unwarned DRB statements. Second, as the Court has already discussed, under these circumstances, the use of uncleansed statements did not violate Article 31 and Sasen has been unable to show such use violates Navy regulations. Further, as discussed above, the record indicates that Sasen's post-DRB statements, made after he had been warned under Article 31(b), were voluntary. Finally, the imposition of the NJP was not based solely on the alleged lie that Sasen made in reporting the incident, but also his failure to report it to Captain Kearns and to properly follow-up with Abril following the incident. Accordingly, any violation based on a lack of a cleansing warning or a failure to give Sasen his Article 31(b) warning prior to the DRB is harmless.

### b. Alleged violation of Sasen's Fifth Amendment rights

The Fifth Amendment's Self-Incrimination Clause provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Sasen argues that there was a violation of this Fifth Amendment provision when superior officers solicited an unwarned, incriminating statement from him at the DRB and subsequently failed to provide a cleansing warning prior to Captain's Mast, and that these facts warrant setting aside the BCNR's decision under § 706(2)(B). Moreover, Sasen argues that the Navy could not show that Sasen's post-DRB waiver of his right to remain silent was knowing and voluntary. Mabus argues that Sasen's Fifth Amendment privilege was never implicated.

In Chavez v. Martinez, a plurality of the Supreme Court held that it is not until a compelled statement is "*use[d]* in a criminal case that a violation of the Self-Incrimination Clause occurs." 538 U.S. 760, 767 (2003) (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990)) (emphasis added). Chavez, further held that a "criminal case" for Fifth Amendment purposes does not "encompass the entire criminal investigatory process, including

police interrogations." Id. Instead, "a 'criminal case' at the very least requires the initiation of legal proceedings." Id. The Chavez plurality concluded that the appellee "was never made to be a 'witness' against himself in violation of the Fifth Amendment's Self-Incrimination Clause because his statements were never admitted as testimony against him in a criminal case." Id.

Following Chavez, the question of what constitutes a "criminal case" under the Fifth Amendment remains unsettled. See Vogt v. City of Hays, Kansas, 844 F.3d 1235, 1239 (10th Cir. 2017) (discussing Supreme Court precedent, resulting circuit split, and collecting cases). The Second, Seventh, Ninth, and Tenth Circuit have all held that the Fifth Amendment can be violated by certain pretrial uses of compelled statements. See Higazy v. Templeton, 505 F.3d 161, 171–73 (2d Cir. 2007) (holding that bail hearing is part of "criminal case" under Fifth Amendment); Best v. City of Portland, 554 F.3d 698, 702–03 (7th Cir. 2009) (suppression hearing); Sornberger v. City of Knoxville, 434 F.3d 1006, 1026 –27 (7th Cir. 2006) (bail hearings, arraignments, and probable cause hearings); Stoot v. City of Everett, 582 F.3d 910, 925 (9th Cir. 2009) (holding that Fifth Amendment violation occurs when "[a] coerced statement . . . has been relied upon to file formal charges against the declarant, to determine judicially that the prosecution may proceed, and to determine pretrial custody status"); Vogt, 844 F.3d at 1241 (probable cause hearing). On the other hand, the Third, Fourth, and Fifth Circuit have held that the Fifth Amendment is solely a trial right. See Renda v. King, 347 F.3d 550, 552 (3d Cir. 2003); Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005); Murray v. Earle, 405 F.3d 278, 285 (5th Cir. 2005). No court since Chavez, however, has held that a Fifth Amendment violation occurs when statements are introduced in the course of *non*-criminal proceedings. Chavez's language clearly restricts Fifth Amendment violations to *criminal* cases. See, e.g., Chavez, 538 U.S. at 766 ("We fail to see how, based on the text of the Fifth Amendment, [appellee] can allege a violation

of this right, since [appellee] was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case.").

Sasen does not discuss <u>Chavez</u>, but relies on two other Supreme Court cases—<u>In re Gault</u>, 387 U.S. 1, 47–48 (1967) and <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004)—to argue that there was a Fifth Amendment violation in this case. <u>Seibert</u> involved a statement that was subsequently introduced against the defendant at a criminal trial and thus is inapposite here where no criminal proceeding has been initiated <u>See</u> <u>Seibert</u>, 542 U.S. at 616–17 (holding that <u>Miranda</u> warnings given mid-interrogation were ineffective and warned confession was therefore inadmissible at trial). <u>Gault</u> considered when the Fifth Amendment privilege against self-incrimination can be invoked. 387 U.S. at 47–48 ("The privilege can be claimed by any citizen in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. . . . it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used."). <u>Gault</u> is also inapposite given the facts of this case because it concerned the *availability* of the Fifth Amendment privilege. Here, the issue is not whether the Fifth Amendment privilege was theoretically available at the time of Sasen's questioning or whether he had a right to invoke it, but whether the Fifth Amendment was actually violated given that no criminal prosecution was ever initiated against Sasen. <u>Chavez</u> makes clear that these inquiries are distinct. <u>See</u> <u>Chavez</u>, 538 U.S. at 771 ("Although our cases have permitted the Fifth Amendment's self-incrimination privilege to be asserted in noncriminal cases . . . that does not alter our conclusion that a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case."). In <u>Chavez</u>, although the appellee was questioned by the police without immunity or <u>Miranda</u> warnings, the Supreme Court held

that there was no Fifth Amendment violation. It explained that "[r]ules designed to safeguard a constitutional right," such as Miranda and the exclusionary rule, "do not extend the scope of the constitutional right itself, just as violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person." Chavez, 538 U.S. at 772.

Here, no statements were ever used against Sasen in a criminal case and Sasen never attempted to invoke his Fifth Amendment privilege to preclude questioning. Moreover, Chavez's language clearly limits Fifth Amendment violations to criminal cases. Neither party has argued that the non-judicial punishment proceedings at issue were criminal in nature.[17] See State v. Myers, 58 P.3d 643, 646–47 (Haw. 2002) ("Numerous federal cases have held that an Article 15 non-judicial proceeding is not a criminal prosecution."). Accordingly, no Fifth Amendment violation occurred in this case.

### c.   Arbitrary and capricious review under § 706(2)(A)

In the alternative, Sasen argues that the BCNR's decision should be set aside because it was arbitrary and capricious. In making this argument, Sasen emphasizes his credentials as a sailor, highlights the fact that he lied to his superior only to protect his subordinate from embarrassment, and notes that some were still calling for his promotion even following the incident at issue. Mabus argues that the BCNR's decision was not arbitrary and capricious because it had a rational basis.

In conducting an arbitrary and capricious review under § 706(2)(A), the Court "focus[es] on whether the agency examined the relevant data and articulated a satisfactory explanation for

---

[17] In making his Fifth Amendment argument, Sasen notes that there might have been criminal consequences from the charges he faced under the UCMJ. The Court does not understand Sasen to be making the argument that such possible consequences turn non-judicial punishment proceedings into criminal proceedings.

its action including a rational connection between the facts found and the choice made." Int'l Jr.
Coll. of Bus. and Tech., 802 F.3d at 106–07. In this case, the Court finds no grounds for
concluding that the BCNR's decision was arbitrary and capricious. The BCNR considered
Sasen's arguments that his punishment was disproportionate to the offense and that he did not
receive full due process, as well as his naval record, the applicable statutes, regulations, policies,
and the advisory opinion provided by the Office of the Judge Advocate General, Criminal Law
Division, dated March 11 2015. AR 2. The BCNR explained that it considered all of the
potentially mitigating factors, but ultimately concluded that they did not outweigh the
seriousness of the offense and the lack of error in the NJP proceedings. AR 3. Further, the BCNR
concluded that the Captain's Mast was not prejudiced by the lack of a cleansing warning. It
further noted that Sasen received the "least severe" punishment available, the written reprimand.
Id. Sasen does not argue that there were any mitigating factors that the BCNR failed to consider.
The BCNR's determination that Sasen appropriately received the least severe punishment
available for his offense is rationally based on the factors presented to the BCNR. The NJP and
the decision to withdraw Sasen's recommendation for advancement were part of distinct and
separate proceedings. As the JAG Advisory Opinion to the BCNR explained, "the responsibility
to recommend or delay a promotion is guided by MILPERSMAN 1616-040 and is [a] strictly
discretionary administrative action under the authority of Petitioner's CO. When an
administrative action is a collateral result of conduct, it is considered separately from any
disciplinary actions." AR 10 (citing United States v. Pena, 64 M.J. 259, 265 (C.A.A.F. 2007)
("As a general matter, the collateral administrative consequences of a sentence, such as early
release programs, do not constitute punishment for purposes of the criminal law."). Sasen fails to
show how the fact that the NJP indirectly led to the withdrawal of the recommendation renders

the BCNR's decision not to overturn the imposition of the NJP arbitrary and capricious.

Furthermore, the fact that Sasen had an impressive naval record prior to the January 11, 2014 incident and that there was some good intention behind the offense does not require the BCNR to find that he was insulated from a non-judicial punishment where such punishment was authorized. The Court notes that providing false information and failing to obey or comply with rules and regulations takes on a different importance in the military context than in the civilian context. See Parker v. Levy, 417 U.S. 733, 743 (1974) ("the military is, by necessity, a specialized society separate from civilian society"). "An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." Id. (quoting In re Grimley, 137 U.S. 147, 153 (1890)). Thus, the BCNR's decision denying Sasen's application for correction of his naval record was neither arbitrary nor capricious.

## VI.   CONCLUSION

Accordingly, the Court finds that, under the APA, there are no grounds to set aside the BCNR's decision, and enters summary judgment in favor of Mabus.

**SO ORDERED.**

Dated: March 27, 2017

/s/ Allison D. Burroughs
ALLISON BURROUGHS
U.S. DISTRICT COURT JUDGE